CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
2/2/2024
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| JULIAN B.[1], | ) |
|     Plaintiff, | ) Civil Action No. 6:23-cv-00008 |
| v. | ) REPORT & RECOMMENDATION |
| MARTIN O'MALLEY,[2] | ) By: C. Kailani Memmer |
| Commissioner of Social Security, | ) United States Magistrate Judge |
|     Defendant. | ) |

Plaintiff Julian B. ("Julian") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Julian alleges that the Administrative Law Judge ("ALJ") erred by (1) failing to make a *Craig* Step One finding; (2) rejecting Beverly's pain and symptom testimony at Step Two of the *Craig* analysis; and (3) failing to account for Beverly's impairment in the use of his right extremity.

This case is before me on referral under 28 U.S.C. § 636(b)(1)(B), dated October 10, 2023. ECF No. 22. Having considered the administrative record, ECF No. 8, the parties' filings, ECF Nos. 14, 21, and the applicable law, I cannot find that the Commissioner's decision is supported by substantial evidence. Accordingly, I respectfully recommend the decision be reversed and the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

---

[1] Due to privacy concerns and because social security opinions often contain intensely personal medical information about claimants, I use only the first name and last initial of the claimant in such opinions.
[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## **STANDARD OF REVIEW**

The court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Julian failed to demonstrate that he was disabled under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). While substantial evidence is somewhat deferential standard, the Court does not "reflexively rubber-stamp an ALJ's findings." *Lewis v. Berryhill*, 858 F.3d 858, 870 (4th Cir. 2017).

"In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig v. Chater*, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period for not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work; instead, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. *See* 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

## **CLAIM HISTORY**

Julian filed for Title II DIB on March 23, 2020, with an alleged onset date of December 1, 2019. R.169–72. Julian telephonically appeared before ALJ Nicholas Foster on February 16, 2022. R. 51–64. ALJ Foster issued an "Unfavorable Decision" in his decision analyzing Julian's claim under the familiar five-step process[4] on March 1, 2022, and so denied Julian's claim for benefits. R. 32–34.

The ALJ found that Julian met the insured status requirements of the Social Security Act on June 30, 2021. R. 37. At the first step, the ALJ found that Julian had not engaged in substantial gainful activity during the period from his alleged onset date of December 1, 2019 through his date last insured of June 30, 2021. *Id.* At the second step, the ALJ found that Julian has the following severe impairments: multiple sclerosis (MS) and neurocognitive disorder. *Id.*

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether she can perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a *prima facie* case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimants age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

As to the third step, the ALJ found that Julian's impairments, either individually or in combination, did not meet or equal a listed impairment. R. 38–40. The ALJ specifically considered listing 11.09 (multiple sclerosis) and 12.02 (neurocognitive disorders). R. 38. The ALJ found that with regard to Julian's mental impairments, Julian had moderate limitations in understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and Julian's ability to adapt or manage himself. R. 38–39. The ALJ found that Julian had only mild limitations in interacting with others. R. 39.

At the fourth step, the ALJ concluded that Julian had no past relevant work. R. 44. The ALJ concluded that Julian has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) except he can occasionally climb stairs or ramps but never ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, crouch, or crawl; he cannot tolerate exposure to hazards (such as unprotected heights or moving machinery); he can understand, remember, and carry out simple instructions and make simple work-related decisions; he can work at a consistent pace throughout the workday but not at a production-rate pace where tasks must be performed quickly; he can tolerate occasional interaction with coworkers and supervisors but no contact with the public; he cannot perform tandem work; he can tolerate occasional changes in routine work settings and procedures or processes; and he should have very little independent decision making with no responsibility for the safety of others. R. 40.

At the fifth step, the ALJ identified jobs in significant numbers in the national economy that Julian could perform, including positions as a routing clerk, sorting clerk, and cleaner. R. 44–45. Thus, the ALJ determined that Julian was not disabled. R. 45. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Julian's request for review. R. 1.

4

Julian appealed ALJ Foster's decision to the Appeals Council on December 1, 2021. R. 230–31. The Appeals Council denied Julian's appeal on November 2, 2022. R. 7–9. On January 5, 2023, Julian requested additional time to file a civil action in this Court seeking judicial review pursuant to 42 U.S.C. § 405(g). R. 5. The Appeals Council granted Julian's request on January 26, 2023. R. 1. Julian then timely filed his appeal to this Court pursuant to § 205(g) of the Social Security Act on February 26, 2023. ECF No. 2.

## ANALYSIS

Julian alleges that the ALJ erred by (1) failing to make a *Craig* Step One finding; (2) rejecting Beverly's pain and symptom testimony at Step Two of the *Craig* analysis; and (3) failing to account for Beverly's impairment in the use of his right extremity.

### A. Medical History Overview

Julian was born on February 7, 1976. R. 169. He has at least a high school education and no past relevant work history. R. 44. Julian has multiple sclerosis and neurocognitive disorder. R. 37. He had previously been employed as a city bus driver; however, he has not worked since December 2019, as he was placed on medical leave because of his impairments. ECF No. 14 at 1.

On December 28, 2019, Julian presented to Lynchburg General Hospital for "intermittent moderate vertiginous dizziness" that began on December 24, 2019, with accompanying confusion, difficulty with balance, and slurred speech. R. 284.[5] He had previously been seen in

---

[5] Julian takes minor issue with the ALJ's summary of Julian's condition at that time as being mere "dizziness." ECF No. 14 at 1. While Julian himself "perseverated over the word dizzy several times," R. 293, the relevant medical records from that time alternate indeterminately between "dizziness," R. 283, 289, 291, 292, 293, 299, "vertigo," R. 289, 299, and "vertiginous dizziness," R. 284. Suffice to say that Julian's condition at that time was both unsteady and unenviable.

the Emergency Department on December 24, 2019, for "vertiginous dizziness and difficulty with gait." *Id.*

Julian was discharged from Lynchburg General Hospital on January 3, 2020. R. 290. At discharge, he was diagnosed with an abnormal brain MRI with probable acute cerebral infarct, diabetes mellitus, hypertension, and tobacco use. *Id.*

After being discharged, Julian underwent rehabilitation at Centra Virginia Baptist Hospital. R. 358–75. During that time, he participated in a multidisciplinary therapy program consisting of physical therapy, occupational therapy, and speech therapy. R. 361. Julian's most prominent deficits were related to balance, coordination, and cognition. *Id.* He displayed increasing weakness in his right hand grip and was ultimately discharged with a primary differential diagnosis of multiple sclerosis. *Id.* He initially improved with IV steroids but progressively declined after the steroid treatment ceased. *Id.* His right upper extremity demonstrated decreased strength rated 4/5 in the shoulder, elbow, wrist, and grip. R. 364. Additionally, he was diagnosed with impaired cognition that worsened while in rehab. *Id.*

Upon discharge from Centra on January 23, 2020, Julian was readmitted to Lynchburg General Hospital that same day with a chief complaint of neurological decline with possible MS. R. 395. His records indicate that his weakness slowly progressed, with his most prominent deficits relating to balance, coordination, and cognition, and worsening right handgrip weakness. *Id.* Julian declined to be placed in a skilled care facility and opted instead to be discharged to his own home to be cared for by his family. R. 380. He was discharged from Lynchburg General Hospital on January 26, 2020, with diagnoses of unsteady gait, abnormal brain MRI, diabetes mellitus, hypertension, tobacco use, conjunctivitis of the right eye, and multiple sclerosis. R. 378–79.

On February 3, 2020, Julian presented to Susan Clapp, ANP, with a chief complaint of a recent diagnosis with MS, and his provider, Home Health, wanted him to follow up sooner than his next scheduled appointment on February 26, 2020. R. 458. A physical examination showed normal motor strength in the upper and lower extremities; however, Julian was unable to stand on one leg and his gait was unsteady. R. 459. He was continuing to undergo physical therapy and occupational therapy at home, and he was using his walker "some" at home but walking without it most of the time. *Id.*

On February 5, 2020, Julian presented to Patricia J. Shipley, M.D., at CMG Neurology, for a hospital follow up for MS. R. 501. Dr. Shipley noted that Julian "had significant improvement in his neurologic function with improvement in his gait, dysarthria, resolution of his ptosis and improvement of his fatigue." *Id.* Recounting the history of Julian's illness, Dr. Shipley stated that Julian had "developed profound fatigue . . . subsequently developed increasingly difficulty with balance and right arm greater than leg weakness . . . [and that] he developed dysarthria which became so severe that he was barely speaking." R. 501–02. At that time, Julian noted residual fatigue, mild dysarthria, decreased fine motor movement in his right hand, intermittent diplopia, and some residual difficulty with his balance; however, he did not note urinary incontinence, anxiety, depression, or cognitive dysfunction. R. 502.

On February 18, 2020, Julian returned to Dr. Shipley's care for M.S. concerns. R. 534. At that time, Julian had to use a wheelchair because he was unable to walk and had a "dead feeling" in his right leg. *Id.* He reported that two days prior, he had developed right leg weakness that increased to the point he could not ambulate without a walker. *Id.* Dr. Shipley noted that she had been trying to get Julian approved for Ocrevus but was unable to because of Julian's lack of insurance. *Id.* On physical examination, Dr. Shipley noted full power throughout with the

7

exception of grade 0 iliopsoas strength, grade 4 quadriceps strength, and grade 2 dorsiflexor strength on the right. R. 535. Dr. Shipley asked Julian to have an MRI of his brain gadolinium, and indicated that an MRI likely had to be done through the emergency room to be completed in a timely fashion. R. 534.

The next day, on February 19, 2020, Julian was admitted to the Emergency Department at Lynchburg General Hospital for complaints that his right leg was not working and of right-sided weakness. R. 417. He reported a loss of motor control in his right leg and foot but normal feeling in both. *Id.* Physical examination showed moderately diminished strength, flexion, and extension of the right hip and knee with "much more significant decreased strength" throughout the right foot and ankle. R. 418. Julian did improve with steroid treatment and was discharged on February 24, 2020, in an improved and stable condition. R. 426.

Julian returned to the care of Dr. Shipley on March 13, 2020, for a one-month follow up. R. 517. Dr. Shipley noted that Julian's "prognostic indicators are poor in that he is having his [M.S.] relapses so close together . . . [and] due to what appears to be some cognitive slowing," and as a result, Dr. Shipley did not believe that Julian should be able to return to working as a bus driver. *Id.* Furthermore, Dr. Shipley noted that both Julian and his mother indicated that Julian had been having some difficulties with short-term memory and cognition, and Dr. Shipley noted that Julian did have slowed cognition on examination. R. 517–18. On physical examination, Dr. Shipley noted grade 4+ right iliopsoas weakness, and Julian's gait was notable for subtle right circumduction. R. 518.

Julian returned to the care of Dr. Shipley on April 1, 2020, for a follow up that was virtual due to the COVID-19 pandemic. R. 551. He reported that his right leg strength had returned to baseline, he was able to ambulate without assistance, and he felt his cognitive

slowing had completely resolved. *Id.* No physical examination was completed due to the virtual nature of the visit.

Julian returned to the care of Dr. Shipley on May 5, 2020, for a two month follow up. R. 586. Dr. Shipley noted that Julian was doing better than he had been. *Id.* At that time, Julian reported that he "believe[d] he has other job opportunities that would not entail driving or be limited by his cognitive dysfunction," but Dr. Shipley noted that finding employment is "often difficult for MS patients whose prime disability is cognitive dysfunction as they appear to be minimally limited and cognition is not included in his [Expanded Disability Status Scale] score." *Id.* Dr. Shipley noted that Julian's "prime disability is his cognitive dysfunction," and that he was continuing to have cognitive dysfunction, with symptoms including forgetfulness and difficulty with executive function. *Id.*

Julian returned to the care of Dr. Shipley on August 11, 2020, for an office visit. R. 561. At that time, Julian discussed with Dr. Shipley the possibility of filing for disability. *Id.* Dr. Shipley noted that, at that time, she believed that "[Julian] could work in some capacity but not during the pandemic both due to the limitations of available jobs and his cognitive limitations." *Id.* She did note that Julian could not return to work as a bus driver "given his mild cognitive dysfunction and intermittent visual symptoms." R. 562. On neurological examination, Dr. Shipley noted that Julian was notable for mild short-term memory loss and executive dysfunction. *Id.*

On August 21, 2020, Dr. Shipley filled out a functional questionnaire. R. 606–11. She listed his symptoms, including gait diplegia, cognitive slowing, and fatigue, with a diagnosis of multiple sclerosis. R. 606. She noted clinical findings of cognitive slowing and unsteady gait. *Id.* When asked to evaluate Julian's functional limitations in a competitive work situation, Dr.

9

Shipley wrote "do not do functional status," but she did note that Julian would sometimes need to take unscheduled breaks during a working day in addition to normal breaks every two hours as a result of his muscle weakness and fatigue. R. 607–08. She noted that Julian would be likely be off task "25% or more" of the time, meaning his symptoms likely would be severe enough to interfere with attention and concentration needed to perform even simple work tasks. R. 610. She did not indicate to what degree Julian can tolerate work stress other than to write the word "possible" in the answer section, and further indicated that Julian's impairments were likely to produce "good days" and "bad days." *Id.* Assuming Julian was trying to work full time, Dr. Shipley indicated that he would be likely to be absent three days per month as a result of his impairments. *Id.* She indicated that Julian's impairments "as demonstrated by signs, clinical findings and laboratory or tests results" were reasonably consistent with the limitations she indicated in the questionnaire. *Id.*

On March 4, 2021, Julian underwent a psychological assessment conducted by Joseph J. Cianciolo, Ph.D., on referral by disability determination services. R. 612–17. Julian had been driven to the assessment by his wife. R. 612. Dr. Cianciolo noted that Julian demonstrated a mildly ataxic gait. *Id.* Julian noted his memory deficit, and Dr. Cianciolo confirmed that Julian's records indicate cognitive deficit and residual right side weakness. *Id.* On the Wechsler Adult Intelligence Scale-Fourth Edition, Julian had a verbal comprehension index score of 87, a perceptual reasoning index score of 88, a working memory index score of 77, a processing speed index score of 71, and a full-scale IQ score of 78. R. 613. Dr. Cianciolo noted that "the results . . . indicated memory deficit across all domains assessed," and that "it appears that the patient is functioning at a lower level currently." *Id.*

Dr. Cianciolo concluded that Julian possessed the intellectual capability to perform simple and repetitive tasks in a relatively unimpaired fashion, but his ability to perform detailed and complex tasks was at least moderately impaired. *Id.* He further noted that "[Julian's] ability to maintain regular attendance in the workplace, perform work activities on a consistent basis, and completing [sic] a normal workday or work week without interruption from psychiatric condition would appear to be mildly impaired." *Id.* Furthermore, with regard to what effects Julian's medical conditions would have on those aforementioned abilities, Dr. Cianciolo deferred to Julian's treating physician. *Id.*

Julian was referred for a medical evaluation performed by Monica Bowler, PA-C, on June 13, 2021. R. 618–25. Mrs. Bowler reviewed the Centra neurology progress notes from August 2020, as well as the discharge summary from Julian's initial hospitalization from December 2019 to early January 2020. R. 618. Mrs. Bowler's general findings included that Julian demonstrated a slower thought process and had a difficult time forming words to describe his symptoms. R. 622. Additionally, he demonstrated 1+ reflexes throughout his upper extremities. *Id.* Overall, Mrs. Bowler claimed that Julian would be able to frequently lift and carry up to 20 pounds; occasionally lift and carry up to 100 pounds; sit for about 8 hours in an 8-hour workday; stand for about 6 hours in an 8-hour workday; walk for about 2 hours in an 8-hour workday; frequently reach, handle, feel, and grasp with both hands; and frequently bend, stoop, kneel, and squat. R. 622–23.

### B. The Commissioner's Decision is Not Supported by Substantial Evidence

First and foremost, the ALJ's decision is riddled with misstatements, mischaracterizations, and omissions of the medical evidence, findings, and statements of Julian's medical providers. While it is not the function of the Court "to re-weigh conflicting evidence,

11

make credibility determinations, or substitute [its] judgment for that of the [Commissioner],"
*Mastro*, 270 F.3d at 176, it is the duty of the Court "to scrutinize the record as a whole to
determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397
(4th Cir. 1974). An ALJ is required to assign weight to **every medical opinion** in a claimant's
record. 20 C.F.R. §§ 404.1527(c) ("Regardless of its source, we will evaluate every medical
opinion we receive."). An ALJ may not cherry-pick, misstate, or mischaracterize material facts
related to his ultimate conclusion. *Arakas v. Comm'r*, 983 F.3d 83, 99 (4th Cir. 2020). Courts in
this Circuit must vacate the Commissioner's decision where an ALJ improperly cherry-picks
facts that support a finding of "not disabled." *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir.
2017).

      In this case, the ALJ wrote in his decision that after Julian was discharged from
Lynchburg General Hospital on January 26, 2020, "[t]he claimant remained home and in good
condition until February 19, 2020." R. 41. This statement mischaracterizes material facts in the
medical records. Notably, Julian presented to the care of Dr. Patricia Shipley for the first time on
February 5, 2020, and he would remain under her care for several months afterwards. R. 501. On
February 5, 2020, Julian noted "residual fatigue, mild dysarthria, decreased fine motor
movement in his right hand, intermittent diplopia and some residual difficulty with his balance."
R. 502. On physical examination, Dr. Shipley noted normal tone, bulk, and power throughout,
with decreased fine motor movement in the right hand. R. 503.

      Then, on February 18, 2020, Julian returned to the care of Dr. Shipley in a wheelchair,
unable to walk, and with a "dead feeling" with attempted right leg muscle use. R. 534. The
record indicates that within a span of about three days, Julian suddenly developed right leg
weakness that progressively worsened into total loss of motor control in his right leg. *Id.* This

incident is material to a disability determination, as it shows the sudden, unexpected, and intense nature of Julian's impairments. This incident directly contradicts the ALJ's finding that the available evidence "does not demonstrate the degree of focus loss or absenteeism that was suggested," R. 41, by Dr. Shipley in the functional questionnaire when she indicated that Julian would be likely to be absent about three days per month as a result of his impairments. R. 610.

Next, the ALJ grossly mischaracterizes the functional questionnaire completed by Dr. Patricia Shipley in August 2020. While the ALJ states "[Dr. Shipley] did say that it was 'possible' that the claimant would be off task 25% or more of a workday," R. 41, the functional questionnaire shows that the "possible" language was in response to a different question altogether. *See* R. 610. Further, Dr. Shipley did not state in the functional evaluation that "she largely does not do functional evaluations," R. 41. Instead, she wrote "do not do functional status" next to a question about functional (primarily physical) limitations in a competitive work situation. R. 607. Dr. Shipley then, accordingly, did not fill out the section related to physical functional limitations other than to indicate that Julian would sometimes need to take unscheduled breaks because of the muscle weakness and chronic fatigue caused by his impairments. R. 607–08. Lastly, the ALJ opined that Dr. Shipley's "opinion was not well supported, with no explanation provided for what evidence led to [her] conclusions," R. 41, but the questionnaire itself is not a highly narrative form, and Dr. Shipley indicated that the symptoms and functional limitations she described in the functional questionnaire were reasonably consistent with Julian's "impairments (physical impairments plus any emotional impairments) as demonstrated by signs, clinical findings and laboratory or test results." R. 610. In other words, Dr. Shipley's explanation for the limitations she indicated was to reference the

medical evidence that she had reviewed and had been witness to since February 5, 2020, when Julian first presented to her care.

Overall, the various mischaracterizations and misstatements of material facts from the record make it appropriate to reverse and remand the Commissioner's decision. *See Lewis v. Berryhill*, 858 F.3d at 869. The issue is compounded considering the numerous times the ALJ references the consistency of medical providers' opinions with the available evidence. R. 41–44. Given that the ALJ's analysis in this case is deficient with regard to his review of the available medical evidence, meaningful review is frustrated as the Court is left to guess at what the ALJ considered, mischaracterized, or omitted in his review, and so remand is appropriate. *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015).

To address the errors raised by Julian himself, Julian first argues that the ALJ did not make an explicit finding at Step One of the *Craig* analysis, failing to determine whether Julian met his threshold obligation of showing medical evidence likely to cause the pain and symptoms claimed. ECF No. 14 at 7–9.

Under *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996), the ALJ must analyze the claimant's pain and symptoms under a two-step test. Step One is a threshold inquiry that requires the ALJ to make a finding as to whether the objective medical evidence supports a finding that the claimant has a medically determinable impairment which could reasonably be expected to cause the pain or symptoms alleged. *Id.* at 591.

Here, while the Commissioner is correct in arguing that "the ALJ correctly **explained** the two-step process" under *Craig*, ECF No. 21 at 10 (emphasis added), Julian is correct in arguing that the ALJ did not make an **express** Step One finding as required by *Craig.* While he noted that he had "considered all symptoms and the extent to which these symptoms can reasonably be

14

accepted as consistent with the objective medical evidence and other evidence," R. 40, he did not make a express finding as to whether Julian had a "medically determinably physical or mental impairment(s) . . . that could reasonably be expected to produce [his] pain or other symptoms," SSR 96-7p at *2.

District Courts within the Fourth Circuit routinely reverse and remand cases where the ALJ failed to make an express Step One finding. *See Janice L. v. Saul*, 2021 WL 9306963, at *8 (W.D. Va. 2021) (collecting cases). As such, because the ALJ in this case failed to make an express Step One finding, remand is necessary in this case.

I take no position on whether Julian is entitled to disability benefits for the relevant period; however, the Court must not "reflexively rubber-stamp the ALJ's findings." *Lewis*, 858 F.3d at 869. The ALJ erred by mischaracterizing, misstating, and omitting material facts from the available medical evidence, as well as by failing to make an express finding at Step One of the *Craig* analysis, and this error requires reversal and remand. On remand, the Commissioner must consider and apply the applicable legal rules to **all** the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming Julian cannot establish that he is disabled based on the available evidence, provide a clear, accurate, and logical link between the evidence the Commissioner found credible and the RFC determination.

## **CONCLUSION**

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Julian's Motion for Summary Judgment, ECF No. 13, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 20, **REVERSE** the Commissioner's final decision,

**REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### NOTICE TO PARTIES

The clerk is directed to transmit the record in this case to Robert S. Ballou, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record.

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party must serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered:  February 2, 2024

*C. Kailani Memmer*
C. Kailani Memmer
United States Magistrate Judge